IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 22, 2002 Session

## STATE OF TENNESSEE v. GEORGIA LUCINDA HAGERTY

**Extraordinary Appeal from the Criminal Court for Washington County**
**No. 26416      Lynn W. Brown, Judge**

---

**No. E2001-01254-CCA-R10-CD      Filed April 23, 2002**

---

We granted an extraordinary appeal, pursuant to Tennessee Rules of Appellate Procedure 10(a), to consider the Washington County Criminal Court's denial of the defendant's *ex parte* motion seeking funds for expert services, as outlined in Tennessee Supreme Court Rule 13 and the holding in *State v. Barnett*, 909 S.W.2d 423 (Tenn. 1995). We stayed the trial court's proceedings pending our consideration of this issue. Upon a thorough review of the record in this case, the briefs of the parties, and the applicable law, we reverse the ruling of the trial court, remand for further proceedings consistent with our opinion, and lift the previously ordered stay so that trial court proceedings may resume.

**Tenn. R. App. P. 10; Ruling of the Criminal Court is Reversed, Vacated and Remanded.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and NORMA MCGEE OGLE, JJ., joined.

Merrilyn Feirman, Nashville Tennessee (on appeal); David F. Bautista, District Public Defender; and Ivan M. Lilly, Assistant Public Defender (at trial), for the Appellant, Georgia Lucinda Hagerty.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Victor J. Vaughn, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

        This case is before us prior to a final adjudication on the merits by way of Rule 10 of the Tennessee Rules of Appellate Procedure, which authorizes review of interlocutory orders of a lower court if it appears that the lower court may have "so far departed from the accepted and usual course of judicial proceedings as to require immediate review," or if it appears "necessary for complete determination of the action on appeal." Tenn. R. App. P. 10(a). Rule 10 further authorizes this court to "issue whatever order is necessary to implement review under this rule," *id.*, and

pursuant thereto we ordered further proceedings in the trial court to be stayed so as not to frustrate our consideration of the issue before us.

The defendant, Georgia Lucinda Hagerty, stands accused by the Washington County Grand Jury of first-degree premeditated murder in connection with the October 11, 2000 shooting death of Leslie John Sullivan. *See* Tenn. Code Ann. § 39-13-202 (Supp. 2001). The indictment for first-degree murder was returned on January 8, 2001. Eight days later, the trial court appointed counsel to represent the defendant and scheduled a trial date of April 4, 2001.

The defendant and the victim apparently had been intimately acquainted and were living together at the time of Sullivan's death. Defense counsel filed numerous pretrial motions, including a March 9, 2001 motion requesting a continuance of the trial date. That motion alerted the trial court that defense counsel were investigating allegations of prior violence by the victim against the defendant with a view toward presenting such evidence at trial. The motion further recited that as of the filing date of the motion, the defendant had not received the autopsy report and that on March 7 the state submitted a witness list, enumerating many more witnesses than were reflected on the indictment.

On March 9, 2001, the defendant also filed under seal with the trial court an *ex parte* motion for expert services, a memorandum of law in support of the motion, and several affidavits in support of the request. Rule 13, section 5 of the Rules of the Supreme Court of Tennessee provides that upon review of the sealed materials and if the defendant has satisfied the threshold pleading requirements, the trial court "must conduct an *ex parte* hearing on the motion and determine if the requested services are necessary to ensure the protection of the defendant's constitutional rights." Tenn. R. Sup. Ct. 13, § 5(b).

Evidently the trial court was satisfied with the preliminary showing that the defendant made in her motion seeking expert services, and it scheduled the motion to be heard *ex parte* on March 16, when the trial court planned to dispose of the other outstanding pretrial motions. At the conclusion of the *ex parte* hearing, the trial court denied *in toto* the requested expert services and ordered that the trial proceed as originally scheduled.

At this juncture, the defendant essentially had three options. She could resume trial preparations and, if convicted, pursue the denial of expert services in her new trial motion and on direct appeal. Second, she could petition the supreme court for review, pursuant to Tennessee Supreme Court Rule 13, section 6(b), which provides in pertinent part that a party "aggrieved by the final action taken with regard to . . . the authorization for expenses, or the authorization for services may petition the Supreme Court for review." Tenn. R. Sup. Ct. 13, § 6(b). In the event the petition for review is granted, the relevant record excerpts are transmitted to the Clerk of the Supreme Court, and review proceeds "*de novo* upon the record unless the court requests additional information." This rule, however, has no obvious mechanism to stay or suspend trial court proceedings while review is being sought. Inasmuch as the defendant in this case was facing an April 4 trial date, less than three weeks away, it is highly improbable that she could have secured a ruling before her trial

commenced and concluded. The last option, which is the one that the defendant pursued, is to ask for discretionary review by this court of the trial court's interlocutory ruling and to seek a stay of the lower court proceedings in the meantime. *See* Tenn R. App. P. 10.

Before turning to the merits of this appeal, we believe it appropriate to offer a few comments about the record before us. In other pretrial motions filed in the lower court, the defendant alluded to investigating evidence of previous violent incidents between the defendant and the victim, and she argued the importance of this type of evidence as it may relate to her state of mind at the time of the shooting. The state, consequently, was on notice of this likely theory of defense.

Then when the trial court clerk, pursuant to this court's order granting Rule 10 review, prepared the record for appeal, the original motion for expert services and other related documents were transmitted to the appellate clerk in envelopes that had been marked sealed by the trial court. The transcript of the *ex parte* hearing regarding expert services, however, was *not* transmitted under seal, and in its brief on the merits, the state cites to specific pages of that transcript, without subsequent objection from the defendant. Moreover, in her brief, the defendant quotes at length from the affidavits of her proposed expert and of an attorney with trial expertise regarding the "battered woman syndrome." For these reasons, we shall refer to or quote from relevant and specific portions of the supporting affidavits and passages of the transcript of the *ex parte* hearing, as needed.

The defendant's motion to the trial court for expert services sought funding, in a specific amount, to retain Keith Caruso, a medical and psychiatric physician who is in private practice in Franklin, Tennessee. According to an affidavit that Dr. Caruso provided and that the defense submitted to the trial court, Dr. Caruso has specialized expertise involving victims who have been repeatedly traumatized, both physically and emotionally, which can lead to posttraumatic stress disorder (PTSD) and can impair the victim's ability to assess threatening situations. In the context of domestic violence, PTSD is sometimes referred to as "battered spouse syndrome" or "battered woman syndrome."[1]

From our review of the record, we glean that the trial court's denial of the request for Dr. Caruso's services was influenced by several considerations. The trial court relied heavily on the absence of evidence that the defendant had a history of mental problems, on her competency to stand trial, and on her "sanity" at the time of the commission of the offense. The trial court characterized

---

[1] The fourth edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, classifies posttraumatic stress as a mental disorder. The *DSM-IV* describes, in pertinent part, the essential feature of this disorder as "the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity." *DSM-IV*, at 309.81, p. 424. Qualifying traumatic events include "violent personal assault." *Id.* "[D]omestic battering" is included as an "interpersonal stressor." *Id.,* p. 425 The *DSM-IV* does not use the phrase "battered spouse syndrome" or "battered woman syndrome" to separately describe domestic-type battering that can lead to posttraumatic stress disorder. For that reason, we shall speak of "posttraumatic stress disorder" in this opinion.

the proof of prior instances of violence by the victim directed at the defendant as establishing only that the defendant had voluntarily stayed in a "bad relationship" instead of leaving or prosecuting the victim for assault. The trial court was critical that the defendant wanted funds to hire an expensive, out-of-town psychiatric expert when the defendant had not first sought an order for the defendant to undergo a local mental health evaluation. For all of those reasons, the court ruled that the defendant had failed to demonstrate a "particularized need" for the services being sought.

We begin our analysis by pointing out that expert assistance for indigent defendants charged with non-capital crimes is of recent legal vintage and can be traced to the 1995 decision of the supreme court in *State v. Barnett*, 909 S.W.2d 423 (Tenn. 1995). Defendant Barnett was convicted of non-capital first-degree murder based on the shooting death of his uncle inside the defendant's grandmother's home. The defendant had a history of mental and emotional disturbances, involving psychiatric hospitalizations. Shortly before trial, Barnett's counsel asked the trial court for an order appointing a state-funded psychiatric expert to assist the defense. The trial court denied the motion, and that denial was affirmed on direct appeal on the basis that no statutory mechanism existed that required or allowed for appointment of an expert in non-capital cases. The supreme court affirmed the denial of services on different grounds and in the process created the present framework for appointment of experts in non-capital cases.

At the time of *Barnett,* funding for experts at state expense was authorized only in capital cases. *See* Tenn. Code Ann. § 40-14-207(b) (Supp. 1994); Tenn. R. Sup. Ct. 13 (1994) (amended 1997). The impetus for funding in capital cases was constitutionally based, in recognition of the United States Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087 (1985), which ruled that when a state musters its prosecutorial forces to bear against an indigent defendant in a capital case, it must take steps to ensure that the accused has a fair opportunity to present a defense. *See id.* at 76, 105 S. Ct. at 1092. A fair opportunity may require a state to provide an indigent defendant with the "basic tools of an adequate defense or appeal." *Id.* at 77, 105 S. Ct. at 1092.

The question in *Ake* was whether the participation of a psychiatrist was sufficiently important to the preparation of the defense as to be considered one of the "basic tools." Taking into account the private and governmental interests affected and the probable value, as weighed against the risk of error in the proceeding if the assistance is withheld, the Court determined that "when the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent." *Id.* at 82-83, 105 S. Ct. at 1096.

The *Barnett* court thoroughly examined the due process underpinnings of *Ake* and concluded that *Ake* applied outside the capital context. "The due process principle of fundamental fairness applies to all criminal prosecutions, and does not rest upon the severity of the sanction sought or imposed." *Barnett*, 909 S.W.2d at 428. The *Barnett* court's work, however, was only half completed. Next, the court proceeded to create the procedural framework to decide when state

funded assistance should be ordered.  The *ex parte* hearing became the load-bearing feature of the framework.

The purpose of the *ex parte* hearing is to determine if the defendant can establish a "threshold showing of particularized need" for the assistance.  *Id*. at 431.  *Barnett* articulated the showing in the following fashion:

> To establish particularized need, the defendant must show that a psychiatric expert is necessary to protect his right to a fair trial. Unsupported assertions that a psychiatric expert is necessary to counter the State's proof are not sufficient.  The defendant must demonstrate by reference to the facts and circumstances of his particular case that appointment of a psychiatric expert is necessary to [ensure] a fair trial.  Whether or not a defendant has made the threshold showing is to be determined on a case-by-case basis, and in determining whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made.  Finally, we emphasize that *Ake*, in our view, does not require the appointment of a psychiatrist who will reach conclusions that the defendant wishes. What is important is that the defendant have access to, and the assistance of, a competent, independent psychiatric expert when he has made the threshold showing of particularized necessity.

*Id.*

In the wake of *Barnett*, Supreme Court Rule 13 was amended in 1997 to govern the provision of "investigative or expert services or other similar services . . . necessary to ensure that the constitutional rights of the defendant are properly protected."  Tenn. R. Sup. Ct. 13, § 5.  In its present form, section 5 of Rule 13 provides in pertinent part,

> (b) Counsel for the defendant must seek authorization for the services considered necessary by motion delivered to the judge of the court setting forth the nature of the services, the name and location of the person proposed to provide the services, an explanation for not obtaining the services in Tennessee if the person proposed to furnish the services is not located in Tennessee, the means, the date, and time and the location at which the services are to be provided, a statement of the itemized costs of the services and the amount of any expected additional or incidental costs, such as court appearances by experts. If the trial court finds that the defendant has satisfied these threshold requirements, the trial court must conduct an ex parte hearing on the

motion and determine if the requested services are necessary to ensure the protection of the defendant's constitutional rights.

(c) If the total expected costs exceed five thousand dollars ($5,000) per expert or the charge per hour of any person or entity furnishing these services exceeds one hundred and fifty dollars ($150) per hour, the proposed expenditures, if authorized by the court in which the case is pending, must also be submitted to the director of the Administrative Office of the Courts for approval by the chief justice before the expenses can be incurred.

*Id*.

In denying the requested expert assistance of Dr. Caruso in this case, the trial court referred multiple times to the decision in *State v. Barnett* as requiring the defendant to make a particularized showing that her "sanity" was likely to be a significant factor in her defense. Neither *Barnett* nor Supreme Court Rule 13, however, limits expert services to a psychiatrist who can support a traditional insanity defense, as defined in Code section 39-11-501. Tenn. Code Ann. § 39-11-501(a) (1997) ("It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts."). Any doubt on this point was removed by the supreme court in *State v. Scott*, 33 S.W.3d 746 (Tenn. 2000), holding that the defendant was entitled to receive expert assistance in the field of DNA analysis and rejecting the notion that Rule 13 expert assistance is limited to a particular field of expertise. Consequently, Dr. Caruso's services are not *per se* disqualified from Rule 13 consideration as potentially necessary to ensure that the constitutional rights of the defendant are properly protected.

Next, the view that the defendant stayed in a "bad relationship" when she could have left or prosecuted the victim illustrates the important nature of the professional assistance requested. Posttraumatic stress disorder has arisen in criminal cases in Tennessee and has been used effectively to explain and educate about the dynamics of an abusive, interpersonal relationship, about the failure of a battered woman to abandon or jettison the relationship, and about the abused woman's perception of imminent danger at the time she commits the acts for which she is later prosecuted. *See State v. Zimmerman*, 823 S.W.2d 220 (Tenn. Crim. App. 1991) (defendant stabbed husband and convicted of second-degree murder; conviction reversed based on ineffective assistance of counsel in abandoning at trial the theory that the defendant was a battered wife, who stabbed husband in self-defense), *on appeal following remand State v. Laurie Zimmerman*, No. 01-C-01-9302-CC-00044 (Tenn. Crim. App., Nashville, Aug. 12, 1993) (defendant convicted of lesser-included offense of criminally negligent homicide). We hasten to add that a jury, obviously, is free to discount any expert testimony about posttraumatic stress disorder, but that decision should rest with a jury after hearing all of the evidence.

The defendant in this case understood the daunting challenge of demonstrating, by reference to specific facts and circumstances, that expert assistance is necessary to ensure – not a

perfect – but a fundamentally fair trial. In our estimation, the defendant made the required showing of "particularized need," and, as we shall explain, the trial court thereby abused its discretion in denying expert assistance. *See Barnett*, 909 S.W.2d at 431 (trial court's denial of expert services reviewed for abuse of discretion).

The first hurdle that the defendant had to clear on the way to showing particularized need was the existence of a pattern of mental and/or physical abuse inflicted by the victim on the defendant. At the motion hearing, the defendant introduced a certified copy of an arrest warrant charging the victim with domestic violence against the defendant. The offense occurred approximately one month prior to the victim's death, and the affidavit of complaint recited that "for all the parties involved safety [sic], and due to the high probability for future violence [Leslie Sullivan] was taken into custody and transported to Washington County Detention Center."

At the motion hearing, the defendant also presented affidavits and live testimony from witnesses with personal knowledge of the victim's repetitively abusive behavior toward the defendant. Two long-time female friends of the defendant provided affidavits relating how the victim had verbally cursed and physically abused the defendant and had threatened to "set her out on the street." One of the more violent episodes involved the victim pushing the defendant out of a moving car and breaking her leg in several places.

A deputy with the Washington County Sheriff's Department testified at the hearing that he was personally acquainted with the couple, that the victim drank constantly, and that he intervened and spoke by telephone to the victim on several occasions in an attempt to "quiet him down."

The deputy's daughter also testified about the victim's verbal abuse of the defendant and about marks and bruises on the defendant, including a black eye. The defendant, who was four feet nine inches tall, would offer excuses, such as falling down or bumping into door frames, but because the deputy's daughter was a certified nursing assistant she did not believe that the injuries were consistent with the defendant's explanations. This witness further testified that before meeting the victim, the defendant was "friendly" and "outgoing." After the defendant became involved with the victim, the defendant became "[w]ithdrawn" and "[s]tuck to herself." According to this witness, the victim "[w]ouldn't let [the defendant] associate with people. Just wouldn't let her have any contact with any of her friends. Just, basically, would always tell her who she could talk to, who she couldn't talk to."

The trial court quizzed another defense witness regarding whether the defendant explained to the witness why she shot the victim.

THE COURT: What did she say?

A. She feared for her life. She was afraid that he would eventually kill her. Something about he was on medication for some kind of depression or something evolving from, I guess, his time in service,

or whatever. And there were times he would go off his medication, and when he went off his medication he was a very violent person.

THE COURT: Did she explain why she didn't leave, and chose to shoot him instead?

A. She was afraid if she tried to leave he would kill her.

In our opinion, this evidence went beyond mere general assertions of domestic violence by the victim and provided a factual foundation with which a requested expert could work.

The second hurdle to be cleared toward establishing particularized need was demonstrating that domestic-type battering can result in post-traumatic stress disorder, which can impair a woman's ability to assess threatening situations. That impairment, in turn, could refute the appearance that a homicide was premeditated. *See State v. Hall*, 958 S.W.2d 679 (Tenn. 1997). In this regard, the defendant provided to the trial court the affidavits of Dr. Caruso and of attorney David L. Raybin.

Dr. Caruso is board certified in psychiatry and forensic psychiatry. He has had extensive training and practical experience in the inpatient and outpatient psychiatric environments, including military service at Camp Lejeune, North Carolina as Division Psychiatrist of the Second Marine Division. Dr. Caruso received specialized training in forensic psychiatry and completed a fellowship at Walter Reed Army Medical Center, which was sponsored by the Army, Navy, University of Maryland, Georgetown University, the U.S. Disciplinary Barracks at Fort Leavenworh, Kansas, and the Federal Bureau of Investigation. He has performed competency and sanity evaluations for the State of Maryland and has served as a psychiatric consultant to the FBI Academy Profiling and Behavioral Analysis Unit. Before leaving the Navy, Dr. Caruso also served as chief of inpatient psychiatry at Walter Reed Army Medical Center in Washington, D.C., and chief of forensic psychiatry at the National Naval Medical Center in Bethesda, Maryland.

Dr. Caruso has been qualified as an expert in numerous criminal and civil cases. He has served as a courtroom consultant in seven military courts martial proceedings, has been employed both by the prosecution and the defense as an expert, and has been appointed as *amicus curiae* in civil and criminal proceedings. After leaving the military, Dr. Caruso moved to Tennessee and since then has been in private practice in Nashville and Franklin.

In his affidavit, Dr. Caruso explained that individuals who are repeatedly traumatized, both physically and emotionally, may develop posttraumatic stress disorder (PTSD). An individual with PTSD, who is "stressed by repeated exposure to the threat of continuing violence[,] may misperceive the degree of threat on the basis of [a] severe mental disease and would thus be incapable of forming the requisite *mens rea* for first degree murder."

Mr. Raybin details in his affidavit his involvement, both as a Davidson County Assistant District Attorney and as private defense counsel, with posttraumatic stress disorder in the

context of domestic abuse and battering. Through his own litigation experience and by consulting with other attorneys, he has developed an understanding of the disorder. As a result of his expertise, Mr. Raybin has lectured on this topic to professional organizations and lay groups, and he has taught classes to mental health professionals. According to Mr. Raybin,

> [E]xpert testimony regarding the battered woman syndrome helps the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense. Expert testimony on the battered woman syndrome helps dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter the "common sense" conclusions by the jury that if the beatings were really that bad then the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that women are masochistic and enjoy the beatings and that they intentionally provoke their husbands.

The information conveyed in Dr. Caruso's and Mr. Raybin's affidavits suffices, in our view, to establish legitimate psychiatric recognition of posttraumatic stress disorder in the domestic abuse or battering context and to explain the value of expert testimony in this area in homicide prosecutions.

The remaining hurdle in this case on the way to establishing "particularized need" was a connection between the facts and circumstances of the homicide at issue and posttraumatic stress disorder. Determining whether this facet of particularized need has been satisfied is a delicate undertaking.

In his affidavit, Dr. Caruso states that he has been made aware that "apparently a substantial amount of information [exists] that suggests that the victim had repeatedly traumatized the defendant, both physically and emotionally, prior to her alleged murder of the victim, who was himself a convicted felon." Dr. Caruso identifies one such incident when the victim shoved the defendant out of a moving car and failed to obtain adequate medical care for the defendant's resulting injuries. According to Dr. Caruso, episodes of this type of abuse may produce posttraumatic stress disorder. Dr. Caruso explained that he needed to conduct a forensic evaluation involving interviews, review of records, and perhaps a physical examination of the defendant.

In his affidavit, Mr. Raybin states that he has reviewed investigative materials sent to him by the defendant's counsel. According to Mr. Raybin, events that are described in those materials, such as drinking by the deceased, prior acts of abuse against the defendant, and forced submissive behavior, are classic attributes of "battered woman syndrome." Mr. Raybin writes, "After reviewing all of this material I am of the opinion that this case definitely presents a significant issue regarding battered woman syndrome." (Emphasis in original).

-9-

Denying expert services in this case because Dr. Caruso could not say, to a reasonable degree of medical certainty, that the defendant suffers from posttraumatic stress disorder would set an unreasonably high standard of "particularized need." Experts typically require advance payment or a reliable guarantee of payment in the future before they undertake the work necessary to arrive at an expert opinion. For that reason, a threshold showing of particularized need does not, in our opinion, require absolute certainty of results. On the other hand, a defendant must satisfy the trial court that he or she is not embarking on a "fishing expedition" in the hope that favorable evidence might be uncovered. *See Barnett*, 909 S.W.2d at 430 ("no abuse of discretion in denying state-paid expert services when the request 'was accompanied by little more than undeveloped assertions that the services were needed to attempt to counter the State's proof'").

Our review of the materials in this case convinces us that the defendant has demonstrated a particularized need for expert assistance in the field of posttraumatic stress disorder that covers domestic-type abuse or battering. Dr. Caruso's and Mr. Raybin's preliminary assessment of the situation and belief in the need for further investigation is persuasive in light of all the facts and circumstances that have been shown to exist. Therefore, we conclude that the trial court erred in rejecting the defendant's bid for expert assistance in her case. Furthermore, the defense request for an expert who resides in Franklin is not unreasonable on its face. Rule 13 states that an explanation of the choice of a particular expert is required only in the event "the person proposed to furnish the services is not located in Tennessee." Tenn. R. Sup. Ct. 13, § 5(b). Absent compelling circumstances, the selection of an in-state expert is entrusted to the sound judgment of defense counsel who are endeavoring to provide effective assistance of counsel, who are obligated to zealously represent their clients within the bounds of the law, and who are officers of the court.

Having concluded that the defendant in this case demonstrated a particularized need for expert services, we are, nevertheless, reluctant to simply accede to the defendant's request. The trial court has a duty to ensure that the requested assistance is tailored to the particular case and necessary. The cost of the requested services is also a legitimate, dutiful concern of the trial court. *See* Tenn. R. Sup. Ct. 13, § 5(a) (trial court may grant authorization for . . . necessary services in a *reasonable amount to be determined by the court*") (emphasis added). Thus, if cost is a particular concern, funding for Dr. Caruso's services could be approved incrementally. In other words, funds could be approved for Dr. Caruso to begin a preliminary investigation. Depending upon the results of that investigation, additional funding thereafter could be authorized. Such an approach may well prove to be a wise investment of judicial resources and an effective cost-control measure.

Finally, upon remand, scheduling matters should also be considered to allow adequate time for an expert evaluation. In the context of the Rule 13 *ex parte* hearing, the defendant and the trial court are not adversaries. *See Barnett*, 909 S.W.2d at 429 ("Only in the relative freedom of a non-adversarial atmosphere can the defense drop inhibitions regarding its strategies and put before the trial court all available evidence.").

Accordingly, we reverse and vacate the ruling of the trial court denying expert services, remand for further *ex parte* proceedings consistent with our opinion, and lift the previously ordered stay so that trial court proceedings may resume.

_____

JAMES CURWOOD WITT, JR., JUDGE